**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

**UNITED STATES OF AMERICA**

**V.**                                                                                     **NO: 3:20CR19**

**CHRISTOPHER CASEY COOK**

<u>**ORDER**</u>

Presently before the Court is Defendant Christopher Casey Cook's ("Cook") Motion to Dismiss Indictment [36]. The United States ("the government") responded in opposition [39], and Cook replied [40]. Having reviewed these submissions, along with relevant authorities, the Court is now prepared to rule.

**Facts**

In 2018 Cook was prosecuted by the State of Mississippi for sale of a controlled substance. The case was widely publicized in the local news and public reference was made to Cook's local Calhoun County business.  Cook was acquitted of all charges by a Calhoun County jury. Not content to quietly accept his victory, Cook made disparaging remarks on the internet about various players in his Calhoun County prosecution. He now finds himself defending a charge of internet harassment in Federal Court.

After his acquittal, Cook published a number of posts on his personal Facebook page about his experiences with the criminal justice system. An affidavit of Federal Bureau of Investigation Agent John Marsh specifically mentioned five Facebook posts made by Cook that Marsh believed supported a Criminal Complaint for cyberstalking. A review of these posts is in order. On June 27, 2019 Cook posted on his Facebook account:

> I have a friend who had an issue in court. The date of her charge was changed for
> some reason. But she didn't have any documentation. So I asked if she took or

1

received a lot of photos and she said yes. I asked her about the meta data and she said that her attorney said metadata can be altered. I asked if she posted photos on Facebook because they keep the photos on a "timeline" . . . I doubt any party could alter Facebook's timeline . . unless they could be like Superman and reverse the spinning of the earth . . .[that will be one heck of an "app for that!"] So my point is that a dated Facebook post of a photo could prove it was taken then or before. .so this is how she can use Facebook in court. People that have secrets are equally concerned with Facebook because of the power it gives an average joe . . so socialize, enjoy, and post photos. . .The great equalizer is the gun but Facebook runs a close 2nd . . . and what you need is there . . . ready to be revealed . .  .God willing. . .

The government alleges Cook posted the following on Facebook on August 19, 2019 [1]:

Cowards Creekmore[2] and Mueller[3] and cowardly judges. Cowardly crooked public defenders. Step down. Dixie Mafia likes to talk about making the wrong people mad. Well congratulations. You did. God gave me a good jury. Now I'm gonna give you what you have been giving my brothers and sisters . . . you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie.

The voluble Cook made two separate posts on January 21, 2020, first:

** *Image appearing to be a screenshot of information found on the internet regarding Mississippi Bureau of Narcotics officer Jon Lepicier, including an address and potential aliases* **

You know that moment when your undercover aliases gets listed as 'Jon Cop?' . don't worry I'm not going to put the fam on here. . . . that karma though..

This was followed by a post several hours later stating:

One poem then but that's it ok? Dedicated to Jamar "JP Smooth" Peterson . . . I'm in the class of 07 At Oak Hill Academy But that's Jonathan Lepicier Jon Davis is my name I tried to convince Casey That I'm really Jon M dad ain't Bob he's like Richard Leon I became a new guy in 2013 That's when JL hit the scene. I'm here I'm there super coll and super Fun. Don't you think Avery goes well with Jun? My folks got like 12 boats and a house in Odessa. . sounds like my wife's alias kinda Without the O or the A Ol buddy you know when you stopped at my restaurant . . . started your lyin? I'll never forget when they told me later "I thought his name was Brian" The end

---

[1] Defendant's Attorney represented that she was unable to locate this alleged Facebook post in the government's discovery materials produced.

[2] Presumably refers to the District Attorney Ben Creekmore who prosecuted Cook in his state court case. [1]

[3] Presumably refers to the Assistant District Attorney Thad Mueller who prosecuted Cook in his state court case. [1]

Finally, on January 23, 2020 Cook posted the following status update:

For those of you who read the stuff about my run ins with supposed law enforcers of the state of MS, I'm going to try to explain it without getting too wordy. The first MBN guy that got after me was someone I had known for a while. He had issues with substance abuse during service among many other "questionable things. He saw me playing guitar at church and formed an idea that I was dealing drugs and hookers and using church as a front. His own ideas. I found out how extremely naïve it can be to believe a badge because of the badge. But the town soaked the rumor up like a sponge. This MBN guy was removed due to his own conduct and that is where the second guy came in. He got an alias and went undercover in 2013. His name pretty much vanished from the internet. He is the one who arrested me in my bathroom. They searched my home. Didn't find any meth anywhere. Had a rubber stamp warrant with my name on it. And a copied stamp of local judge. Judge rushes a few words by me. (I had a right to a hearing which I didn't get, etc. He couldn't talk about the case). Didn't know anything about it.). . I bonded out for $575.00, meaning they really didn't have evidence of a sale of meth but that was the charge. Of course MBN wanted to use my personal knowledge and facilities to set up others but I refused. When I got out of jail the story on WTVA news was a picture of me, a mugshot, with a history of dealing dope out of my motel, it said they had investigated me for 6 months and that I had 3.5 grams of meth on me. That's when it hit me that the guys in jail were right. I had been used as a distraction. I later found out what happened that day. July 19, 2018. Knowing there could be no evidence so no grand jury, I went to work getting after their butt while they send in more people hoping to get the evidence they had already charged and arrested and slandered by fake news without. . . I uncovered a Ponzi scheme indictment system, where the prosecution and many defenders across MS work together. They self indict every possible felony whether evidenced or not. The forgeries are endless and obvious to the untrained eye. They see what lawyer you have. He could be on the team. They aren't likely to dismiss because the ace in the hole is cheating in court . . . we caught 3 errors that would have overturned had they gotten conviction. Not to mention the arresting officer has everything he needs already. He knows his team has his back. He even signed for foreman and ADA. The DA over the whole district came to help put me away because he knew I had discovered his bottom up frivolous indictment system. (I termed it BUFI). I emailed him many times. They know it's wrong and they know getting away with murder here is easy. . . but Facebook gets them extremely stressed out. Just go to the courthouse and as ADA, who I refer to as TJ. . . he is very angry over my facebook. But it's all true and that will come to light soon enough. The rest of the scheme is . . . hold back discovery 8 months to a year and write continuances without consent to take asway Speedy trial right, hoping defendant will plead, which they do 100% of the time . . . minus one case. . . mine. Now for me it's war. I'm sick of the corruption in this state. Sick of the scapegoating and unsolved murders, cover ups and fake news so that the whole system is too busy covering up to do any justice elsewhere. It's a mess and the people turn a blind eye here. Those that could help remain passive. Those that can't pay just get stuck in the thing or get stuck in drug court whether they do drugs or not and those that try them, get cheated and sent off. They pay probating and restitution to the county, the arresting, the appointed lawyer and whatever else they

3

can tack on. My own loved ones won't acknowledge my truth half the time, so I don't care what anyone thinks. I uncovered the family of the arresting person. His real name, parents, grandparents, sisters, wife, nephew, properties owned, past phone numbers, aliases of the whole family, in laws . . . which had him very puzzled as to how I did it. But I was nice enough to use poetry that only he would understand when posting what I knew. This guy has had affairs and paid numerous people to get something on me since early 2017, including his only witness, a real meth dealer. How ironic (sigh). . . I guess carrying the torch of his brother in arms and certainly angry that I make them look like little Johnny in the 4th grade. And God willing I'm going to take them out. With or without the help of the people. So far he has been willing and all credit be to him.

The Indictment [18] is a one and a half page document in which a grand jury found that Cook threatened Mississippi Bureau of Narcotics Agent Jon Lepicier by "revealing the address of, and names of family members" and "did threaten him and his family by posting:

> "I uncovered the family of the arresting person. His real name, parents, grandparents, sisters, wife, nephew, properties owned, past phone numbers, aliases of the whole family, in laws, . . . which had him very puzzled as to how I did it. He has taken down some resources and Facebook pages or changed them. But I was nice enough to use poetry that only he would understand when posting what I knew;" and

"And God willing I'm going to take them out;" [18]

Interestingly, when you compare the "posts" the government presented to the grand jury in the indictment, to the full posts reproduced above, it appears that the government "cherry picked" certain statements and re-arranged them in a different sequence and context to give the posts a more ominous effect.[4] In the preceding and intervening sentences of the post that were cut out by the government in the indictment, Cook identified no less than six other persons or entities in the post with whom he had grievances (see references to the First MBN officer on Cook's state court case, WTVA, the local elected state court judge, the ADA, the DA, and the "local meth dealer")

---

[4] This Court notes initially that it does not seem fair for the government to be allowed to present statements out of context to a grand jury when context is the critical issue in play. In a now famous interview, former New York State Chief Judge Sol Wachtler stated something along the lines of "a grand jury would 'indict a ham sandwich' if that's what [a prosecutor] wanted." In the same vein, it does not seem sporting for the government in this case to present evidence as a ham sandwich when all they have is baloney.

regarding what he alleged was a fraudulent indictment scheme perpetuated by various elected government officials.

The Court also notes that the government has not alleged that Cook ever directly contacted Mr. Lepicier, any member of Lepicier's family, or any of the other people he named in his posts via direct message, email, telephone, letter or otherwise. So, for Mr. Lepicier or any of his family members to see Cook's posts, they would have to actively search for Cook's Facebook page and scroll through his "wall" to find the actual posts.

## Discussion

### I.    *Background of §2261(A)(2)(B)*

18 U.S.C. §2261A, commonly referred to as the cyberstalking statute, was enacted in 1996 after the legislature realized that the Violent Crime Control and Law Enforcement Act of 1994, which aimed to protect current/former spouses and intimate partners from their stalkers, was so narrowly drafted that it did not address cases in which the victim was unrelated to the stalker. Since the Act's enactment, it has been amended four times, in 2000, 2006, 2013 and again in 2018. It is the 2013 version of the statute which applies in this case. The 2013 version of 18 U.S.C. §2261A(2)(B) states that:

> Whoever—
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
>> (B) causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A), shall be punished as provided in section 2261(b) of this title.

The most notable changes between the 2006 and the 2013 versions are (1) the addition of intent to "intimidate" among the offense's various possible mental states, and (2) the statute

now criminalizes a course of conduct that "causes, <u>attempts to cause, or would be reasonably expected to cause</u> substantial emotional distress."

## II.    Conduct or Speech?

By its own terms, §2261A(2)(B) regulates <u>conduct</u>, or to be precise, "courses of conduct." However, "'[c]onduct,' . . . may also enjoy First Amendment protection if it is significantly imbued with elements of communication." *United States v. Ackell,* 907 F.3d 67, 73 (1st Cir. 2018); citing *Texas v. Johnson,* 491 U.S. 397, 404 (1989).

The United States Circuit Court for the First Circuit found in *United States v. Ackell* that §2261A(2)(B) does not target speech. However, the facts before the *Ackell* Court were starkly different from the facts here. In *Ackell,* the defendant, who was over 40, was prosecuted because he was involved in a romantic internet relationship with a 16-year-old girl under the pretense that he was 21. When she attempted to end the relationship, he informed her through direct messages and emails that she could not opt out of the relationship because she was "caged," presumably because she had previously furnished compromising photos of herself, and he threatened that if she stopped sending him additional compromising photos that he would disseminate the photos of her to her friends, classmates, and family. In essence, Ackell had actual contact with the victim, and sent threats directly to her numerous times. Indeed, Ackell was engaged in repeated <u>conduct</u> that was threatening to a victim and was prosecuted for the <u>acts of directly threatening the victim</u>.

In the case before us today, the government has not alleged that Cook ever directly contacted any of the subjects of his Facebook posts. Rather, Cook is being prosecuted solely on the <u>content of his public posts</u> – not the <u>act of posting</u>.

It is worth noting that the *Ackell* Court distinguished its holding, stating "while acknowledging that §2261A(2)(B) could have an unconstitutional application, and remaining cognizant of the chilling-effect-related concerns . . . [s]hould situations arise where the statute is

applied to courses of conduct that are sufficiently expressive to implicate the First Amendment, we are confident that as applied challenges will properly safeguard the rights that the First Amendment enshrines." *United States v. Ackell,* 907 F.3d 67, 77 (1st Cir. 2018).

This Court will now examine implications of the First Amendment protection of speech as applied to this case.

### III.    Broad Protections of The First Amendment

The First Amendment states in part, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Indeed, "the First Amendment protects speech even when the subject or manner of expression is uncomfortable and challenges conventional religious beliefs, political attitudes or standards of good taste." *United States v. Cassidy,* 814 F.Supp.2d 574, 582 (D. Md. 2011); citing *United States v. Stevens,* 559 U.S. 460 (2010). Further, the Supreme Court has "consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern. This is because 'in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide "adequate breathing space" to the freedoms protected by the First Amendment.'" *Id.*

While the internet did not exist when our founders contemplated First Amendment protections in 1791, courts have routinely recognized that the internet is just the "newest medium for . . . uncomfortable expression touching on political matters" and that the "First Amendment's command [does] not vary when a new and different medium for communication appears." *United States v. Cassidy,* 814 F.Supp.2d 574, 582 (D. Md. 2011); citing *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870 (1997); *Cassidy* also citing *Brown v. Entm't Merch. Ass'n,* 131 S.Ct. 2729, 2733 (2011).

Even though numerous court decisions have been published protecting uncomfortable speech posted on the internet, not all speech is protected. Indeed, "there are certain 'well-defined

and narrowly limited classes of speech' that remain unprotected by the First Amendment." *United States v. Cassidy*, 814 F.Supp.2d 574, 582 (D. Md. 2011). The narrowly limited unprotected classes of speech include (a) obscenity, (b) defamation, (c) fraud, (d) incitement, (e) true threats, and (f) speech integral to criminal conduct.

The 'true threat' category of unprotected speech is the least developed exception to the First Amendment. The Supreme Court has only discussed true threats in a handful of cases, largely leaving Circuit Courts to develop their own approach. The Second Circuit in *U.S. v. Kelner*, has developed a particularly detailed approach stating that a true threat is one that "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner*, 534 F.2d 1020 (2nd Cir. 1976).

The Fifth Circuit's established approach is to ask whether a communication "in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *U.S. v. Myers*, 104 F.3d 76, 79 (5th Cir. 1997). The Fifth Circuit has discussed the Second Circuit's analysis in *Kelner,* and has stated that "immediacy, or clarity of purpose, . . . was the key to distinguishing true threats." *Shackleford v. Shirley,* 948 F.2d 935, 939 (1991). The Fifth Circuit has also stated that to distinguish "political hyperbole" from a "true threat," the statements must be analyzed "in context" to determine if they are true threats punishable by law. *U.S. v. Morales,* 272 F.3d 284, 287 (5th Cir. 2001). Further, "[i]n order to convict, a fact finder must determine that the recipient of the in-context threat reasonably feared it would be carried out." *U.S. v. Morales,* 272 F.3d 284, 287 (5th Cir. 2001); citing *Myers,* 104 F.3d at 80.

A.      Cook's Facebook Posts are not "True Threats"

The Fifth Circuit has commented on "true threat" or "true threats" in 20 cases. Of these 20, only six discuss statements made by a citizen and whether that statement constituted a true threat. None of the cases discuss a public statement, like Cook's post on his Facebook.

*US v. Howell*, a 1983 case, featured a hospital patient who was reported for making threatening statements against the President of the United States. *United States v. Howell*, 719 F.2d 1258 (1983). The defendant told an F.B.I. agent, who was sent to interview him, that he had a .357 caliber pistol and that there were two people he wanted to kill, one being the President. *Id.* Howell also made the statements "it's too bad that John Hinckley did not get him. I will kill the president if I get the chance" and "if released, I would make my way to Washington and kill him—I will kill the President." *Id.* The next day, Howell delivered a letter further outlining his statements regarding killing the President. *Id.* The Fifth Circuit affirmed the District Court ruling that the statements constituted true threats.

In the 2001 case of *US v. Morales,* Morales, an 18 year old student repeatedly told a stranger in an internet chat room that he wanted to kill teachers and students at Milby High School in Houston, Texas and he attempted to make reference to Eric Harris (one of the perpetrators of the Columbine High School killings). *U.S. v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001). The woman he relayed the threats to contacted the police because she was concerned about the Milby High School students. *Id.* The Court stated that under the *Myers* interpretation of 18 U.S.C. 875(c), all that was required was general intent. Here, in its context, Morales repeated his specific threats to kill several times, referred to a perpetrator of a violent and horrific school shooting and gave no indication that he was joking. *Id.* Nothing Morales said in that chat room could be construed as political speech, religious speech or public concern. In fact, Morales used the phrases "I will kill"

and "YES F NE ONE STANDS N MY WAY WILL SHOT"[sic] which could not be mistaken. As such, the Fifth Circuit affirmed the District Court ruling that the speech was a true threat.

In 2004 the Fifth Circuit ruled in *Porter v. Ascension Parish School Board* that a drawing depicting a violent siege on a school by a 14 year old student of that school was not a true threat because it was not intentionally communicated to the public. *Porter v. Ascension Parish School Bd.*, 393 F.3d 608 (2004). Because the student's drawing was completed in his home, stored in his home for two years, was never intended to find its way to the school, and was unwittingly taken to the school by his younger brother, the Fifth Circuit held that the Court did not have to determine whether the drawing would constitute a true threat because the student did not intentionally or knowingly communicate it. *Id.*

In 2011, the Fifth Circuit ruled in *US v. Dwyer,* a case in which a bankruptcy court debtor emailed an employee of the bankruptcy court where his suit was pending stating:

> Well, please convey to Judge Brown my belief that he can "try" to protect the CRIMINALS Duval, Lemelle and Dennis, but he can't protect them from themselves, and the "damage" is already done. As is the case with Judge Porteous, their impeachment is "just a matter of time". Also convey to Judge Brown a reminder that I have been totally without money since the weekend of January 8, 9, and 10, and that I have been without my anti-depressant medication, for which I have sought leave to pay Walgreen's from my most recent Social Security check, since last weekend. I could not sleep last night, which I attribute to the effects of abruptly stopping my medication on Sunday, the 24th (my pills "ran out", and I have no money to purchase more). Maybe my creditors would benefit from my suicide, but suppose I become "homicidal"? Given the recent "security breach" at 500 Poydras Street, a number of scoundrels might be at risk if I DO become homicidal. Please ask His Honor to consider allowing me to refill my prescription at Walgreen's, and allowing me to pay them, which is a condition for my obtaining a refill. Please communicate this missive to creditors and their counsel. Thank you.

The district court dismissed the indictment in *O'Dwyer,* finding that after reviewing the statement and its context, it did not constitute a true threat because it was hypothetical and conditional. Additionally, the email "did not threaten bodily harm to any particular individual." Even though the email was sent directly to a court employee with a message for Judge Brown, O'Dwyer never

10

identified any individual whom he intended to harm. Further, the Fifth Circuit took into consideration that O'Dwyer had a documented history of using coarse and hyperbolic language in prior court proceedings. As such, O'Dwyer's email was not found to be a true threat, and the Fifth Circuit affirmed the dismissal of the indictment.

In 2015, *Bell v. Itawamba County School Board* was appealed to the Fifth Circuit for a third time. Bell involved a rap song sang and posted on the internet by a high school student referencing two coaches' inappropriate behavior towards female students and included some violent lyrics like "I'm going to hit you with my rueger (sic)" and "middle fingers up if you want to cap that [expletive]," which the school system found threatening, intimidating and harassing towards the coaches named. *Bell v. Itawamba County School Bd.,* 799 F.3d 379 (5th Cir. 2015). The Fifth Circuit found that *Tinker's* off-campus speech standards applied distinguishing *Bell* in a way providing little value to the analysis required here.

Certain common threads weave through all of the Fifth Circuit cases in which a true threat was found; first, the threat specifically identified a target; second, the threat was specific enough as to place, time or method to take the threat seriously; and finally, the threat was made directly to the intended target or to a third party. None of these cases discuss what we shall call a "bulletin board threat."

Cook's Facebook posts are not "true threats" precluding him from First Amendment protection. Cook's posts, when read in context, lack entirely the specificity required to bring them under the umbrella of a true threat. Nowhere in any post does Cook explicitly state that he plans to physically harm Lepicier, or any other named public official. "God willing I'm going to take them out" is not the same as telling an FBI agent you have a pistol and you will use it to kill the president or repeatedly and directly telling another person in a chat room that you were going to kill the students in your high school while making references to one of the Columbine shooters.

See respectively, *United States v. Howell,* 719 F.2d 1258 (1983); *U.S. v. Morales,* 272 F.3d 284, 287 (5th Cir. 2001). In fact, in this Court's view, Cook's posts were even less severe than the one made in *O'Dwyer,* in that O'Dwyer emailed a court staffer directly, and specifically made mention of "homicide" and security breaches at the court's address which would provide opportunity. This Court finds that Cook's statement "And God willing I'm going to take them out. With or without the help of the people. . ." is even more vague than the references O'Dwyer made using the word "homicide." Cook's phrase, when read with the succeeding sentence regarding the help of the people, could be interpreted to mean that he wishes to "take them out" of office or their positions of power based on the context of the entire post being about the "fraudulent indictment scheme" or "BUFI" that Cook seemingly is warning the public about. When read in context, Cook's posts are nothing more than a manifesto of his grievances regarding people and processes which he perceived to have wronged him; they do not rise to the level of true threats.

Additionally, none of the Fifth Circuit cases discuss a situation in which a person's information, such as address or family members' names, is shared publicly; a phenomenon sometimes referred to a "doxing" or "doxxing".[5] Certainly, sharing public information, while potentially offensive and disagreeable, does not rise to the level of a true threat. As such, that portion of the indictment referring to "threaten[ing Jon Lepicier] and his family by posting" must be dismissed. [18]

## B.     Cook's Facebook Posts are Protected First Amendment Speech because they discuss Matters of Public Concern

The First Amendment protects those engaged in speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps,*

---

[5] Merriam-Webster has stated that the term doxing or doxxing dates at least as far back as 2009, and means " to publicly identify or publish private information about a person – especially as a way of punishing the person or getting revenge," and is likely derived as a variation of "dropping docs" or "doc-dropping" which described the same act.  https://www.merriam-webster.com/words-at-play/not-playing-nice-doxing-and-swatting

562 U.S. 443, 453 (2011); citing *Connick v. Myers*, 461 U.S. 138, 146 (1983). Even when speech is arguably "inappropriate or controversial . . .[it] is irrelevant to the question [of] whether it deals with a matter of public concern." *Snyder v. Phelps,* 562 U.S. 443, 453 (2011); citing *Rankin v. McPherson,* 483 U.S. 378, 387 (1987). Deciding whether speech is of public or private concern requires the Court to examine the "content, form, and context" of the speech throughout the "whole record." *Snyder v. Phelps,* 562 U.S. 443, 453 (2011). Additionally, the Fifth Circuit has held that "where speech 'complained of misconduct within the police department', it should be classified as speech addressing a matter of public concern." *Thompson v. City of Starkville, Miss.,* 901 F.2d 456, 463 (5th Cir. 1990); citing *Brawner v. City of Richardson,* 855 F.2d 187, 192 (5th Cir. 1988). Specifically, this district has said "speech complaining of misconduct within [a public entity] is speech addressing a matter of public concern." *Scott v. Corrections Corp. of America,* 2014 WL 4988383, at *9 (N.D. Miss. 2014); citing *Alexander v. Eeds,* 392 F.3d 138, 142 (5th Cir. 2004).

Here, it is clear that the Mississippi Bureau of Narcotics, the officers of the Mississippi Bureau of Narcotics, the publicly elected state court judge, the publicly elected District Attorney, and the public officials employed by the District Attorney are all either political figures, or public officials employed by public entities. While the Court does not find it to be in good taste to post publicly available identifying records, "poems" written which vaguely reference information known about employees of public entities, or to use phrases like "and god willing I'm going to take them out," the Court recognizes that Mr. Cook does have the constitutionally protected right to say such things. When viewed in their entirety, the five posts of Mr. Cook reproduced above read to be an attempt by Mr. Cook to expose what he views to be misconduct within the Mississippi Bureau of Narcotics, the District Attorney's Office and the Calhoun County Court System.

Counsel for the defendant argues in her brief that her client's internet chatter is no more threatening than the jabberings spewed daily from the bully pulpit of the highest office in the land.

Indeed, it is a measure of our times that communications on so-called "social media," traveling under brand names such as Facebook and Twitter, are often jejune and truculent, speaking in slogans, cartoons, symbols, and brief "come-aparts." Such speech, coarse as it may be, is protected. The Court will not recount all of the examples listed by Defense Counsel in her brief, but does note on February 25, 2020 President Trump "doxxed" a jury forewoman, both tweeting her name and going so far as to say:

> There has rarely been a juror so tainted as the forewoman in the Roger Stone case. Look at her background. She never revealed her hatred of "Trump" and Stone. She was totally biased, as is the judge. Roger wasn't even working on my campaign. Miscarriage of justice. Sad to watch![6]

and as recently as June 20, 2020 the President of the United States tweeted:

> BIG COURT WIN against Bolton. Obviously, with the book already given out and leaked to many people and the media, nothing the highly respected Judge could have done about stopping it…BUT, strong & powerful statements & rulings on MONEY & on BREAKING CLASSIFICATION were made . . . .Bolton broke the law and has been called out and rebuked for so doing, with a really big price to pay. He likes dropping bombs on people, and killing them. **Now he will have bombs dropped on him.**[7]

If prosecutors choose to tolerate the above grievances coming from the highest office in the land, then surely a Calhoun County citizen should likewise be allowed to vent his grievances. Their complaints are cut from the same cloth. Otherwise, our criminal justice system suffers the appearance of selective enforcement.

### C.    Criminalization of Cook's Facebook Posts would Amount to an Impermissible Content Based Restriction of Speech

The District Court of Maryland in *U.S. v. Cassidy* dismissed an indictment in a 2015 case where a man posted on Twitter, a blog and other internet websites about a local religious leader

---

[6] @realDonaldTrump, Twitter (Feb. 25, 2020), https://twitter.com/realDonaldTrump/status/1232395209125707776
[7] @realDonaldTrump, Twitter (June 20, 2020), https://twitter.com/realdonaldtrump/status/1274366497360613381?lang=en. (*emphasis added*).

and her congregation. *U.S. v. Cassidy,* 814 F.Supp.2d 574, (D. Md. 2011). In *Cassidy,* the defendant befriended a monk of a Buddhist sangha (hereinafter "KPC")[8] claiming that he too was a Buddhist American and expressed an interest in meeting A.Z., the first (and possibly only) American born female tulku.[9] After Cassidy had been a member of KPC for some time, A.Z. invited the defendant to a retreat. While they were in the car, A.Z. confided to the defendant about her abusive past and a failed marriage. *U.S. v. Cassidy*, 814 F.Supp.2d 574 (D. Md. 2011). The Defendant then proposed marriage to A.Z., asked her to pretend they were married during the retreat, and also asked if she wanted him to kill her ex-husband – all of which A.Z. declined. *Id.* After some behavior inconsistent with the KPC's beliefs, A.Z. investigated Cassidy's lineage and learned that he was never a tulku. *Id.* Upon being confronted with his lie, Cassidy left the retreat, and began using Twitter and blogs to post about A.Z. and KPC. *Id.* In total, over 350 tweets were directed at A.Z., thousands of tweets discussed A.Z. and KPC, and a blogspot account contains two posts "not necessarily directed at A.Z., a statement pertaining to A.Z., and a derogatory statement about KPC." *U.S. v. Cassidy,* 814 F.Supp.2d 574 (D. Md. 2011). The Tweets, which are too numerous to reproduce here in their entirety, include the following:

> *Sunday, May 20, 2010:* "ya like haiku? Here's one for ya: "Long, Limb, Sharp Saw, Hard Drop" ROFLMAO."
>
> *Tuesday, June 22, 2010:* "want it to all be over soon sweetie?"
>
> *Tuesday, December 7, 2010:* "Got a wonderful Pearl Harbor Day surprise for KPC. . . wait for it."
>
> *Friday, June 25, 2010:* "[A.Z.] you are a liar & a fraud & you corrupt Buddhism by your very presence: go kill yourself."

---

[8] The Sanskrit word *sangha* is the community of followers and practitioners of Buddha's path and teaching. https://www.britannica.com/topic/sangha
[9] A tulku is the "corporeal existence of enlightened Buddhist masters in general" and are believed to be rebirths of previous tulkas. The most famous example of a tulku lineage is the Dalai Lamas, who are said to be rebirths of the previous thirteen Dalai Lamas. New World Encyclopedia, https://www.newworldencyclopedia.org/entry/Tulku.

> *Thursday, December 9, 2010:* "A strong wind @ryderjaphy will blow down the KPC house of cards once and for all. They live by extortion now, and they live hand to mouth."
>
> *Tuesday, December 28, 2010:* "DOWN WITH KPC! The fascist insect that preys on the life of Buddhism in the West!! DOWN WITH (Victim I)! The corrupt poser who has nothing."
>
> *Sunday, July 25, 2010:* "I have just one thing I want to say to [A.Z.], and its form the heart: do the world a favor and go kill yourself. P.S. Have a nice day."

*Id.* at Appendix A.

Likening posting on Twitter or a blog to a public bulletin board, the District Court of Maryland stated:

> Because this case involves First Amendment issues, terms that were in use by citizens when the Bill of Rights was drafted may help in understanding the legal context of Blogs and Twitter. Suppose that a Colonist erects a bulletin board in the front yard of his home to post announcements that might be of interest to others and other Colonists do the same. A blog is like a bulletin board, except that it is erected in cyberspace rather than in one's front yard. If one Colonist wants to see what is on another's bulletin board, he would need to walk over to his neighbor's yard and look at what is posted, or hire someone else to do so. Now, one can inspect a neighbor's Blog by simply turning on a computer.
>
> . . .
>
> One does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or email specifically addressed to and directed at another person, and that difference, as will be seen, is fundamental to the First Amendment analysis in this case.

*U.S. v. Cassidy,* 814 F.Supp.2d 574, (D. Md. 2011). Further, the district court noted that the

Supreme Court has "consistently classified emotionally distressing or outrageous speech as

protected, especially where that speech touches on matters of political, religious or public

concern." *Id.* As such, the district court found that "while Mr. Cassidy's speech may have inflicted

substantial emotional distress, the Government's Indictment here is aimed squarely at protected

speech: anonymous, uncomfortable Internet speech addressing religious matters." *Id.* at 583.

The *Cassidy* court conducted a secondary analysis regarding content-based restrictions on

public speech, reiterating, "[i]n determining whether a statute is content-neutral, one must

determine whether "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 584. Further, a law or restriction is content-based if it "regulates speech based on the effect that that speech has on an audience." *Id.* Cassidy allegedly violated the statute by "intentionally causing substantial emotional distress to A.Z., specifically on Twitter and blogs." *U.S. v. Cassidy,* 814 F.Supp.2d 574, 584 (D. Md. 2011). The Maryland Court found the restriction as applied to Cassidy to be a content based restriction because it limited speech on the basis of whether that speech was emotionally distressing to A.Z.

It is well settled that a content-based restriction on speech must survive strict scrutiny – meaning that to survive strict scrutiny the government must show that the content based restriction "is necessary to serve a compelling state interest." *Id.* The Maryland court did not find "protecting victims from emotional distress sustained through an interactive computer service" to rise to the necessary state interest level because the Supreme Court has underscored the fact that the above referenced interest is not a compelling one. *Id.* at 586. "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes." *Id.*; quoting *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 813 (2000). The Maryland court ruled that A.Z. had the ability to protect "her own sensibilities simply by averting" her eyes from the Defendant's blog and by not looking at or blocking his Tweets. *U.S. v. Cassidy,* 814 F.Supp.2d 574, 585 (D. Md. 2011). And because the government's interest in criminalizing speech that inflicts emotional distress is not a compelling one, the statute as applied to Cassidy did not survive strict scrutiny. *Id.*

Of all the First Amendment cases reviewed in this Order, *Cassidy* is most similar to the instant case. In each case the defendant posted brash public commentary about an individual or group on an internet forum and was then prosecuted for the posts under §2261A. But arguably,

Cassidy's thousands of tweets/posts were far more numerous than the five Cook has been flagged for. One difference between the two is that Cassidy was posting about a religious leader, while Cook was posting about public entity employees, a public entity, and publicly elected political figures – but in the Supreme Court's eyes, religion, politics, and criticism of public entities as a form of public concern are all protected forms of speech under the First Amendment. This Court also reads the types of language and phrasing of the posts by both men to be eerily similar; both Cassidy and Cook like to use vague sayings whether it be Cook's "god willing I'm going to take them out," "I'm gonna give you what you have been giving my brothers and sisters . . . you are finished. Because I'm coming and hell is coming with me. And I'm not just quoting a movie," or Cassidy's "want it to all be over soon," and his reference to a horrific day in history like Pearl Harbor.

Further, while the Court does not condone publishing publicly available personal information, like a person's address, there is simply no existing framework in the United States which criminalizes the act of "doxing" or "doxxing" private citizens; and certainly re-sharing a public record doesn't arise to the severity of sharing someone's bank records or social security number.

Just as in *Cassidy*, Cook is being prosecuted for the content of his public posts. His indictment very clearly states that he is being charged because his posts "caused and would reasonably be expected to cause substantial emotional distress to a person, a spouse of that person or an immediate family member of that person." [18] Because Cook's speech allegedly violated the statute by intentionally causing or knowingly reasonably causing emotional distress to Lepicier and/or his family specifically on Facebook, the portion of §2261A(2)(B) relied on in the Indictment amounts to a content-based restriction.

Since the statute as applied to Cook is content-based, the Government has the burden of showing that the content-based restriction "is necessary to service a compelling state interest." *U.S. v. Cassidy,* 814 F.Supp.2d 574, 585 (D. Md. 2011); citing *First National Bank of Boston v. Bellotti,* 435 U.S. 765 (1978). Here though, just as in the Supreme Court's ruling in *United States v. Playboy Entm't Group, Inc.*[10] and in the District Court of Maryland's ruling in *Cassidy*, the benefit of the content based restriction to shield sensibilities of the listener or reader <u>is just not enough</u> to supplant a citizen's right to uncomfortable public discourse. Here, Lepicier, his family, the local state court judge, the ADA, the DA, the local meth dealer, and the local news station all have the ability to protect their "own sensibilities simply by averting" their eyes from Cook's Facebook page, and as such §2261A(2)(B) as applied to Cook's Facebook's posts does not survive strict scrutiny and the Indictment must be dismissed.

## IV. Facial Validity of §2261(A)(2)(B)

The Defendant's motion to dismiss his indictment argues that this Court should find the cyberstalking statute to be facially unconstitutional on several grounds, or to find the cyberstalking statute to be unconstitutional as applied to Cook because it is a content based restriction on speech regarding public concern.

The government heavily relies on a single case in its response, *U.S. v. Conlan,* a case in which the Fifth Circuit upheld the facial validity of the 2006 iteration of the cyberstalking act. The 2006 version was revised by Congress in 2013. As such, the government wholly failed to address a majority of the arguments raised by the defendant.

---

[10] *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803 (2000)(Supreme Court ruled it was unconstitutional to require cable television operators to "fully scramble or otherwise fully block" sexually oriented programming during hours when children are unlikely to be viewing between 10p.m. and 6a.m. because the statute was "unnecessarily restrictive content based legislation violative of the First Amendment").

The Court has discussed at length the constitutionality of §2261(A)(2)(B) as applied to Cook, and although the Defendant also raised the issue of facial validity of the statute as a whole, including arguments regarding overbreadth and vagueness, this Court will not address these facial challenges because the Court concludes that the statute is invalid as applied. The Supreme Court has reasoned that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it" and "it is not the usual judicial practice . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily – that is before it is determined that the statute would not be valid as applied." See respectively *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 5002 (1985); *Bd. Of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 484-85 (1989); see *US v. Cassidy*, 814 F.Supp.2d 574, 587 (D. Md. 2011); see also *US v. Popa,* 187 F.3d 672, 678 (D.C. Cir. 1999). As such, this Court will curtail its ruling of the constitutionality of the statute as a whole, as finding the statute unconstitutional as applied is all that is necessary in this case to dispose of the case before it.

## Conclusion

Because 18 U.S.C. §2261(A)(2)(B) is unconstitutional as applied to Christopher Casey Cook, his Motion to Dismiss Indictment is **GRANTED**.

**SO ORDERED**, this the 13th day of July, 2020.


/**s**/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**